Argued and submitted December 20, 2007, reversed and remanded August 20, petition for review denied December 24, 2008 (345 Or 503)

## STATE OF OREGON,
*Plaintiff-Appellant,*

*v.*

## KIRK PATRICK ALLEN,
*Defendant-Respondent.*

Clackamas County Circuit Court
CR0500858; A131465

191 P3d 762

Susan G. Howe, Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Kristin A. Carveth, Deputy Public Defender, argued the cause for respondent. With her on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

EDMONDS, P. J.

## EDMONDS, P. J.

Defendant was charged with forgery, ORS 165.013, giving false information to a peace officer, ORS 162.385, and five counts of identity theft, ORS 165.800. The state appeals the trial court's pretrial order under Article I, section 9, of the Oregon Constitution granting defendant's motion to suppress all evidence obtained by the police resulting from a contact with defendant that ended with his arrest on outstanding arrest warrants, including items seized after the search of his jacket.[1] We review the lawfulness of searches and seizures for errors of law, but we defer to the trial court's findings of historical fact so long as there is sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). We reverse and remand.

The following facts taken from the record are not in dispute. At approximately 12:30 a.m., Oregon City police officers, including Officer Weaver, were informed by their dispatcher that a suspect was allegedly violating a Family Abuse Prevention Act restraining order. Pursuant to that information, the officers went to a residence in a trailer park where the alleged violation occurred, after which they determined that the suspect had recently left that location. Weaver knew that the suspect was an associate of another resident in the park, so the officers went to that location. After contacting the resident, they were informed that the suspect was not inside. However, the police requested, and the resident consented to, a search of the premises.

After entering the trailer, the officers saw defendant sitting on a living room couch. Although the officers knew that defendant was not the person they were looking for, they asked defendant for his name, date of birth, age, and Social Security number. Defendant said that his name was Hobbs and gave his purported date of birth and age. Initially, defendant provided an age that did not match the date of birth that

---

[1] Article I, section 9, provides,

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

he had given, but he ultimately gave an age that was consistent. Defendant appeared nervous to Weaver, and Weaver suspected, given the circumstances, that defendant was lying about his identity. At that point, Weaver later testified, he was "investigating [the] crime of giving false information to the police" and that defendant was not free to leave. However, he did not inform defendant of that fact. To ascertain defendant's identity, an officer checked the name Hobbs with the Driver and Motor Vehicle Services Division on his mobile computer. The record does not disclose whether defendant was cognizant of the fact that the police were checking on his identification. The information received in return was that defendant did not match the photo, height, or weight of Hobbs.

The record does not reveal whether the officers confronted defendant about those discrepancies. However, the record does show that, after the officers learned that defendant had lied to them, defendant spontaneously jumped from the couch and ran toward the back of the trailer. An officer followed defendant, handcuffed him, and brought him outside where Weaver was. At that point, according to Weaver, defendant was "in custody." At some point, another officer read defendant his *Miranda* rights. Defendant eventually admitted that he had lied about his identity because there were outstanding warrants for his arrest. After obtaining defendant's true name, Weaver confirmed that defendant had six outstanding arrest warrants and thereafter arrested him on those warrants.

After arresting defendant on the warrants, Weaver asked defendant if he wanted his leather jacket, which was hanging on a doorknob inside the residence, and "[h]e said he did." Weaver then searched both defendant and the jacket for weapons, implements of escape, and contraband. According to Weaver, he searched the jacket "[b]ecause [he] knew * * * that [defendant's] person and all of his property would be thoroughly searched by the jail staff, and to make sure there were no implements of escape or other contraband on him at that time." Inside the jacket, Weaver found Hobbs's driver's license, two pieces of identification with defendant's photograph but an incorrect name, and credit cards and checks

with other people's names. Some of the checks had been altered.

Defendant eventually was charged with forgery, giving false information to a peace officer, and five counts of identity theft. Before trial, defendant moved to suppress the evidence seized from his jacket. At the hearing on the motion, the only witness who testified was Weaver. The trial court granted defendant's motion to suppress, concluding that the officers had violated defendant's rights under Article I, section 9, when they attempted to ascertain his identity. This appeal by the state follows.

The state asserts that the trial court erred in granting the motion to suppress because, in its view, no restraint of defendant's liberty occurred as the result of the officers' inquiry about defendant's identity. Alternatively, even if defendant was unlawfully detained, the state argues, the later discovery of the arrest warrants purged any taint from that detention. It follows, the state concludes, that the evidence in the jacket was discovered pursuant to a lawful search.

Defendant responds that he was detained without reasonable suspicion that he had committed a criminal offense, that he was subsequently arrested without probable cause, that the state failed to carry its burden of proving that the discovery of the arrest warrants attenuated the link between the unlawful detention and the later search of his jacket, and that the state failed to establish that the jacket pockets were opened and inventoried pursuant to an applicable inventory policy. For all those reasons, defendant concludes that the trial court properly granted his motion to suppress.

The Supreme Court has identified three categories of officer-citizen encounters. *State v. Holmes*, 311 Or 400, 407, 813 P2d 28 (1991). First, "mere conversations" are consensual interactions between police officers and citizens that do not implicate Article I, section 9, and do not require justification. *Id.* Second, "stops" are temporary restraints on a person's liberty and are a seizure under Article I, section 9, that must be justified by reasonable suspicion that a crime

has been committed. *Id*. Third, arrests, which are also seizures under Article I, section 9, must be justified by probable cause to believe that the arrested person has engaged in criminal activity. *Id*. Our consideration of whether a defendant has been seized, by either stop or arrest, "involves a fact specific inquiry into the totality of the circumstances surrounding the encounter to determine whether the officer has intentionally and significantly interfered with the defendant's liberty, or whether the defendant, in an objectively reasonable manner, believes that his or her liberty has been restricted." *State v. Highley*, 219 Or App 100, 105, 180 P3d 1230 (2008) (citing *Holmes*, 311 Or at 407).

■ In this case, in light of subsequent events, we need not decide whether the officers significantly interfered with defendant's liberty without reasonable suspicion when they asked him to identify himself while he was seated on the couch. Defendant argues that, when one of the officers pursued him down the hallway, handcuffed him, and brought him outside to the patrol car, the officer lacked probable cause to believe that he had committed any criminal offense that would warrant a lawful arrest. "Probable cause" means that "there is a substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it." ORS 131.005(11). To determine whether probable cause exists, we consider the totality of the circumstances presented to the officer and the reasonable inferences that may be drawn from those circumstances; no single factor is dispositive, and "[t]he fact that there are possible lawful explanations for a person's behavior does not preclude the conclusion that there was probable cause." *State v. Kappel*, 190 Or App 400, 79 P3d 368 (2003), *rev den*, 336 Or 509 (2004).

■ Weaver testified that he believed that he was "investigating [the] crime of giving false information to the police." That offense is embodied in ORS 162.385, which provides:

> "(1)   A person commits the crime of giving false information to a peace officer for issuance or service of a citation or for an arrest on a warrant if the person knowingly uses or gives a false or fictitious name, address or date of birth to any peace officer for the purpose of:

"(a) The officer's issuing or serving the person a citation under authority of ORS 133.055 to 133.076 or ORS chapter 153; or

"(b) The officer's arresting the person on a warrant."

To demonstrate that a defendant violated ORS 162.385, the state must show (1) that "the person knowingly uses or gives a false or fictitious name, address or date of birth to any peace officer" and (2) that the officer asked for that information for the purpose of "issuing or serving the person a citation" or "arresting the person on a warrant."

In this case, defendant gave the officers a false name, date of birth, and age while he was seated on the couch. However, at the time, the officers were not in the process of issuing a citation to defendant or arresting him on a warrant—a necessary element of ORS 162.385. It follows that they could not have had probable cause to believe that defendant had violated ORS 162.385. We conclude therefore that the initial arrest of defendant was without probable cause to believe that he had committed a crime.

■ The state argues, nonetheless, that "the subsequent discovery of defendant's outstanding arrest warrants purged any unlawful taint of defendant's [arrest]." Defendant, relying on *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), responds that the police would not have learned defendant's true identity but for the initial unlawful arrest, and therefore "the discovery of defendant's outstanding arrest warrants did not break the causal connection between defendant's unlawful seizure and the subsequent search." In *Hall*, the court explained how Oregon's exclusionary rule operates in these circumstances:

"Although the aim of the Oregon exclusionary rule is to restore a defendant to the same position as if 'the government's officers had stayed within the law,' this court has rejected the notion that evidence is rendered inadmissible under Article I, section 9, simply because it was obtained after unlawful police conduct or because it would not have been obtained 'but for' unlawful police conduct. Instead, as this court recently explained in *State v. Johnson*, 335 Or 511, 520-21, 73 P3d 282 (2003), after a defendant establishes the existence of a minimal factual nexus—that is, at

minimum, the existence of a 'but for' relationship—between the evidence sought to be suppressed and prior unlawful police conduct, the state nevertheless may establish that the disputed evidence is admissible under Article I, section 9, by proving that the evidence did not derive from the preceding illegality. To make that showing, the state must prove that either (1) the police inevitably would have obtained the disputed evidence through lawful procedures even without the violation of the defendant's rights under Article I, section 9; (2) the police obtained the disputed evidence independently of the violation of the defendant's rights under Article I, section 9; or (3) the preceding violation of the defendant's rights under Article I, section 9, has such a tenuous factual link to the disputed evidence that that unlawful police conduct cannot be viewed properly as the source of that evidence."

339 Or at 24-25 (some citations omitted).

Initially, we conclude that defendant has established the required minimum factual nexus between the evidence sought to be suppressed (including items obtained from the search of the jacket) and the prior unlawful police conduct (the unlawful arrest of defendant). Thus, we must consider whether, under the totality of the circumstances, the state has carried its burden under *Hall* to prove that the preceding violation of defendant's rights under Article I, section 9, has such a tenuous factual link to the disputed evidence that the unlawful police conduct cannot be viewed properly as the source of that evidence.

In support of its contention that the discovery of the arrest warrants purged the taint of the unlawful arrest, the state points to *State v. Dempster*, 248 Or 404, 407-08, 434 P2d 746 (1967), and *State v. Snyder*, 72 Or App 359, 361, 695 P2d 958, *rev den*, 299 Or 251 (1985),[2] where we and the Supreme

---

[2] In *Snyder*, the defendant was taken to a police station and questioned about his involvement with a burglary. He was advised of his *Miranda* rights and thereafter admitted his true name and volunteered that there might be a warrant for his arrest in another county. We held, without deciding whether a prior unlawful detention had occurred, that the discovery of an outstanding arrest warrant and the arrest of the defendant on that warrant purged the taint of the prior illegality, if any, once the police learned the defendant's true identity. 72 Or App at 364.

Court held that the existence of an outstanding arrest warrant can serve to attenuate the link between a police illegality and evidence discovered thereafter. As we recently explained:

> "*Dempster* and *Snyder* involve circumstances where the searches of the defendants followed the discovery of an outstanding arrest warrant. Under those circumstances, the taint of a prior illegal stop was purged because the searches were made incident to arrests based on the arrest warrants. *In other words, the discovery of the outstanding arrest warrants and their execution constituted intervening events that interrupted the causal connection between the seized evidence and the prior illegal stops and thereby provided an alternative lawful basis for the subsequent searches.*
>
> "* * * In those cases, the subsequent searches were deemed lawful because they were incident to lawful arrests that actually occurred."

*State v. La France*, 219 Or App 548, 558, 184 P3d 1169 (2008) (emphasis added).

In this case, Weaver testified that, after defendant was arrested in the hallway, he was brought outside the mobile home to where Weaver was sitting in his patrol car. At that time, defendant admitted his true identity and indicated that there were outstanding warrants for his arrest. However, the record does not reveal whether defendant volunteered that information or whether those statements were in response to further police questioning. Weaver confirmed that outstanding warrants existed in Washington and Multnomah counties for defendant's arrest and arrested him on those warrants. Weaver also asked defendant if he wanted to take his jacket with him, and "[h]e said he did." The jacket was retrieved from where it had been hanging on a doorknob inside the residence, and Weaver testified that he searched defendant and the jacket incident to the arrest on the warrants. Once Weaver discovered the existence of the outstanding warrants, there existed an alternative legal basis for the subsequent search. Based on the above circumstances, we conclude, as we did in *Snyder*, that the intervening and independent event of the discovery of the outstanding arrest warrants operated to attenuate the taint of the prior unlawful arrest.

■     Finally, defendant asserts, "[E]ven if this court concludes that defendant was not unlawfully seized, or that discovery of defendant's outstanding warrants purged the taint of his illegal seizure, the record cannot justify the subsequent search of defendant's jacket[.]" Our review of the record, however, demonstrates that the trial court never considered that issue. To affirm a trial court's conclusion based on the right for the wrong reason doctrine, it is necessary that "the record materially be the same one that would have been developed had the prevailing party raised the alternative basis for affirmance below." *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001). Here, the trial court did not reach the issue framed by defendant's argument because it concluded that defendant was unlawfully detained when the officers inquired about his identity. On remand, the parties will have the opportunity to litigate the lawfulness of the search of defendant's jacket as incident to his lawful arrest on the outstanding arrest warrants or pursuant to an administrative inventory policy.

Reversed and remanded.